IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DONLYN DISTRIBUTION, INC., d/b/a DONLYN2 INC., formerly Donlyn Inc., an Illinois corporation and BARBARA MITCHELL, individually and on behalf of DONLYN DISTRIBUTION INC., d/b/a/ DONLYN2 INC., formerly Donlyn, Inc., an Illinois corporation, | |
| Plaintiffs, | No. 01 C 5728 |
| v. | Judge Ronald A. Guzmán |
| BP AMOCO CORPORATION, also known as BP Amoco Oil Company, and formerly known as Amoco Oil Company, a Maryland Corporation and CHICAGO TRANSIT AUTHORITY, an Illinois municipal corporation, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs have sued defendants for their alleged violations of a variety of federal and state laws. Defendants, BP Amoco Corporation ("BP") and Chicago Transit Authority ("CTA"), have each filed a motion pursuant to Federal Rule of Civil Procedure ("Rule") 56 for summary judgment on the claims asserted against them. For the reasons set forth below, the motions are granted as to the federal claims and the Court declines to exercise its supplemental jurisdiction over the state-law claims.

## Facts

Despite receiving a number of extensions of time from the Court, plaintiffs failed to file any response to defendants' Local Rule 56.1(a) Statement of Uncontested Material Facts. That omission is costly. According to the Local Rule, "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." N.D. ILL. LR 56.1(b)(3)(B); *see Koszola v. Bd. of Educ. of City of Chi.*, 385 F.3d 1104, 1109 (7th Cir. 2004) ("We have emphasized the importance of local rules and have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment.") (alteration and citation omitted). By failing to respond to defendants' LR 56.1(a) Statement, plaintiffs have admitted all of the properly supported facts set forth in it. Thus, what follows is drawn entirely from defendants' statement of facts.

BP is a Maryland corporation that manufactures and sells fuel. (Defs.' LR 56.1(a) Stmt. ¶ 1.) Donlyn is an Illinois corporation owned and operated by Barbara Mitchell, an African-American woman. (*Id.* ¶¶ 3-4.)

On March 4, 1998, BP entered into a contract with CTA to provide it with low sulfur diesel fuel ("the 1997 contract"). (*Id.* ¶ 27.) On March 17, 2000, BP entered into a second such contract with CTA ("the 1999 contract"). (*Id.* ¶ 29.) Both of those contracts had a goal of 30% participation by Disadvantaged Business Enterprises ("DBEs"). (*Id.* ¶ 58.) Enterprises like Donlyn, that are owned and controlled by African Americans, are considered to be DBEs. (*Id.* ¶¶ 55-57.)

Initially, BP used Phoenix Oil as the DBE for the 1997 CTA contract. (*Id.* ¶ 122.) In May 1999, Phoenix Oil stopped working for BP. (*Id.* ¶ 147.) As a result, BP approached Donlyn, which had worked with BP since 1992, about becoming a DBE for that contract. (*Id.* ¶¶ 105, 127.)

2

In October 1999, Donlyn entered into a contract with BP to deliver fuel to the CTA ("the subcontract"). (*Id.* ¶¶ 22, 24-25.) The subcontract had a start date of October 1, 1999 and an end date of September 30, 2001. (*Id.* ¶ 22.) In the subcontract, Donlyn agreed to rate of 1.25 cents per gallon ("cpg") for fuel that it both purchased and hauled to CTA and 1.5 cpg for fuel it only hauled for the 1997 contract. (*Id.* ¶¶ 134, 183-84.) On December 1, 1999, Donlyn began hauling fuel from BP to the CTA pursuant to the subcontract. (*Id.* ¶ 144.)

From May 1999, when Phoenix stopped working with BP, and December 1999, when Donlyn started working with BP, BP performed its contract with the CTA without a DBE. (*Id.* ¶ 148.) To make up the deficiency in its DBE participation, BP had Donlyn serve as the distributor, that is, both to purchase and haul all of the CTA's fuel, for the remainder of the 1997 contract. (*Id.* ¶¶ 150, 153.)

When BP bid for the 1999 CTA contract, it included Donlyn as a DBE but proposed to have it act as the distributor for only half of the fuel sold to the CTA and to act only as a hauler for the other half. (*Id.* ¶¶ 159-60, 174.) Donlyn agreed to participate in the 1999 contract at a rate of 1.75 cpg for distribution services and 1.9 cpg for hauling services. (*Id.* ¶¶ 195-96.) From April 1, 2000 to December 21, 2000, Donlyn invoiced BP at those rates for the fuel it purchased and/or delivered to the CTA, and BP paid those invoices. (*Id.* ¶¶ 202-03, 221-22.)

To act as a distributor under the contracts, Donlyn had to purchase fuel from BP. (*Id.* ¶ 248.) Because Donlyn did not have the resources to make those purchases, BP and Donlyn operated under a jobber buy-back arrangement. (*Id.* ¶¶ 249-50.) Under that arrangement, BP would electronically deposit the purchase price of the fuel plus Donlyn's fees into an account set up for that purpose immediately before each purchase. (*Id.*) After Donlyn delivered the fuel and invoiced BP, BP would

electronically debit the account for the purchase price of the fuel, leaving Donlyn's fees in the account. (*Id.* ¶ 251.)

In late 1999 and early 2000, BP began receiving non-sufficient funds ("NSF") statements from the account with Donlyn when it tried to debit the purchase price of the fuel. (*Id.* ¶¶ 256-67.) By the end of 2000, Donlyn's account had generated over $5 million in NSFs. (*Id.* ¶ 268.)

In September 2000, Donlyn and BP agreed to have a third-party perform an account reconciliation. (*Id.* ¶¶ 271-72.) Jefferson Wells International performed the reconciliation and ultimately concluded that Donlyn owed BP $947,724.07. (*Id.* ¶¶ 272, 281.)

On December 7, 2000, BP gave Donlyn a letter demanding payment of $835,425.59, the amount the reconciliation revealed that Donlyn owed through October 31, 2000. (*Id.* ¶ 292.) To date, Donlyn has not paid BP for any of the NSFs. (*Id.* ¶ 294.) Donlyn's failure to pay those sums violates the terms of the parties' contract. (*Id.* ¶¶ 295-96.)

Four days later, Donlyn complained to the CTA's DBE compliance department that BP had created a "fraudulent DBE expenditure allocation scheme." (*Id.* ¶ 301.) The letter did not, however, accuse BP of race discrimination. (*Id.* ¶ 304.)

One week later, on December 18, 2000, Donlyn sent the CTA another letter, which accused BP of discrimination. (*Id.* ¶¶ 310-11.) The CTA investigated Donlyn's claims and found them to be without merit. (*Id.* ¶¶ 318-37.)

On December 20, 2000, Donlyn told the CTA by letter that it would make no further deliveries under the 1999 contract. (*Id.* ¶ 339.) On December 22, 2000, without notice to BP, Donlyn stopped hauling fuel to the CTA, though there were six months left on the subcontract with BP. (*Id.* ¶¶ 348-49.)

4

Plaintiffs now claim that BP and CTA discriminated against them on the basis of Mitchell's race in connection with the 1997 and 1999 CTA contracts.

## The Legal Standard

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

## Discussion

### The Federal Claims

In Count VI of the first amended complaint, plaintiffs allege that BP violated their rights under 42 U.S.C. § 1981 ("section 1981"), which, among other things, prohibits racial discrimination in the making and enforcement of contracts. *See* 42 U.S.C. § 1981(a). BP contends that Mitchell does not have standing to pursue a section 1981 claim on her own behalf.

The Court agrees. According to the Seventh Circuit, only those persons who are parties to a contract may bring suit under section 1981. *See Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 303 (7th Cir. 2000) (stating that "[t]he class of persons who may bring suit [under section 1981]

5

is . . . limited to persons who actually wish to enter into (or remain in) [a contractual] relationship."); *cf. Flynn v. Merrick*, 881 F.2d 446, 450 (7th Cir. 1989) (stating, in the context of a 42 U.S.C. § 1983 claim, that "a plaintiff-shareholder cannot maintain a civil rights action for damages suffered by the corporation"). It is undisputed that Donlyn, not Mitchell, was a party to the contracts with BP. (*See* Defs.' LR 56.1(a) Stmt. ¶¶ 133-38.) Thus, she has no standing to pursue a section 1981 claim on her own behalf.

Though Donlyn has standing to pursue a section 1981 claim, BP contends that its claim fails on the merits. Donlyn can prove its claim by offering direct evidence of discrimination or by using the *McDonnell Douglas* burden-shifting method of proof. *Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 176 (7th Cir. 1996) ("We analyze § 1981 discrimination claims in the same manner as claims brought pursuant to Title VII of the Civil Rights Act."). Donlyn has offered no direct evidence of discrimination. Thus, it must comply with the indirect method if it is to defeat BP's motion.

Under the indirect method, Donlyn must first establish a *prima facie* case of discrimination by showing that: 1) it is owned or operated by members of a protected class; 2) it was meeting BP's legitimate expectations; 3) it suffered an adverse contractual action; and 4) BP treated similarly situated persons outside of the protected class more favorably. *Id.* Once Donlyn has established a *prima facie* case, the burden of production shifts to BP to articulate a legitimate, nondiscriminatory reason for its actions. *O'Neal v. City of Chi.*, 392 F.3d 909, 911 (7th Cir. 2004). If BP carries its burden, Donlyn must show that the proffered reasons for the challenged actions are merely a pretext. *Id.* BP contends that Donlyn cannot make a *prima facie* case.

The Court agrees. It is undisputed that Donlyn stole money from BP and summarily quit hauling fuel for it when there were six more months left on the subcontract. (*See* Defs.' LR 56.1(a) Stmt. ¶¶ 256-86, 292-94, 348-49.) Thus, Donlyn was not meeting BP's legitimate expectations. There is also no evidence that Donlyn suffered an adverse contractual action. On the contrary, it is undisputed that BP paid Donlyn at the rates to which the parties had agreed and did not terminate the contract even after Donlyn refused to repay the money it had stolen. (*See id.* ¶¶ 202-03, 221-22, 292-96, 348-49.) Finally, there is no evidence to suggest that BP gave more favorable treatment to non-minority contractors. In fact, the record shows that the rates BP paid to the non-minority haulers that replaced Donlyn were the same as or less than the rates BP had paid to Donlyn. (*See id.* ¶¶ 391-93.) Because Donlyn has not made a *prima facie* case of discrimination, BP's motion for summary judgment on its section 1981 claim must be granted.

In Count VIII, Donlyn claims that CTA treated it less favorably than non-minority DBEs in violation of 42 U.S.C. § 1983 ("section 1983"). It is not clear whether Donlyn is using section 1983 to redress alleged violations of its section 1981 rights or its Fourteenth Amendment equal protection rights. Ultimately, it does not matter because Donlyn's claim fails regardless of how it is construed.

It is undisputed that Donlyn was not in a contractual relationship with CTA. (*See* Defs.' LR 56.1(a) Stmt. ¶¶ 22-23, 28, 31-32, 44-46, 51-52, 75.) Thus, Donlyn cannot sue CTA for violations of section 1981. *See Kyles*, 222 F.3d at 303 (7th Cir. 2000).

Donlyn fares no better with an equal protection claim. To prevail on such a claim, Donlyn must prove that "(1) [it] is otherwise similarly situated to members of the unprotected class; (2) [it] was treated differently from members of the unprotected class; and (3) the defendant acted with discriminatory intent." *Greer v. Amesqua*, 212 F.3d 358, 370 (7th Cir. 2000). Donlyn has offered

no evidence to suggest that any other DBE, non-minority or otherwise, received a more prompt or thorough complaint investigation or was otherwise treated more favorably by the CTA. Accordingly, CTA is entitled to judgment as a matter of law on any Fourteenth Amendment claim Donlyn asserts against it.

## State-Law Claims

Having dismissed all of Donlyn's federal claims, the Court declines to exercise its supplemental jurisdiction over the state-law claims it asserts. *See* 28 U.S.C. § 1367(c)(3).

## Conclusion

For the foregoing reasons, the CTA's motion for summary judgment [doc. no. 73] is granted as to the federal claim asserted against it and BP's motion for summary judgment on the federal claim asserted against it [doc. no. 74] is granted. The Court declines to exercise its supplemental jurisdiction over the state-law claims asserted against both defendants, thus BP's motion for summary judgment on the state-law claims [doc. no. 75] is stricken. This case is hereby terminated.

**SO ORDERED.** ENTERED: JUL - 1 ?

HON. RONALD A. GUZMAN
**United States District Judge**